# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
   **Plaintiff,**

 v.              Case No. 09-CR-103

**KENNETH KRUEGER**
   **Defendant.**

## DECISION AND ORDER

The government charged defendant Kenneth Krueger with producing and possessing child pornography. Defendant moved to suppress evidence obtained by police through a consent search of his computers, arguing that the search exceed the scope of his consent. The magistrate judge handling pre-trial proceedings in this case held a hearing, then recommended that the motion be denied. Defendant objects, so I must review the matter de novo. See Fed. R. Crim. P. 59(b)(3).[1]

## I. FACTS

Milwaukee Police Department ("MPD") Detective Doreen Andrews, a member of the High Technology Unit assigned to investigate internet crimes against children, testified that on March 18, 2009, she, MPD Detective Richard McQuown and FBI Special Agent Kim French traveled to defendant's residence as part of a child pornography investigation. (June 15, 2009 Evid. Hr'g Tr. at 5-6.) The officers arrived at about 10:20 a.m. and knocked on the door, which

---

[1] De novo review does not require a de novo evidentiary hearing. See United States v. Raddatz, 447 U.S. 667, 673-76 (1980). Neither side asks me to hold another hearing, and I find the record made before the magistrate judge sufficient for me to rule on the motion.

was answered by defendant's wife, Inthavy Krueger.[2] Andrews introduced herself and the other officers, stated that they were there for an investigation involving computers, and asked Inthavy if they could speak with her. (Id. at 7.) Inthavy agreed and admitted the officers, leading them to the kitchen. Andrews asked if anyone else was present (aside from a child she had seen), and Inthavy indicated that her husband was upstairs and had just gone to bed. (Id. at 8.) Andrews asked to speak with defendant, and Inthavy agreed to retrieve him. Within two or three minutes, Inthavy returned, indicating that defendant would be right down. (Id. at 8-9.) While they were waiting, Andrews asked Inthavy about the computers in the residence, and Inthavy stated that there was a laptop computer belonging to her in the family room adjacent to the kitchen , a computer belonging to her children upstairs, and a computer defendant used in the basement . (Id. at 9.)

Within a few minutes, defendant appeared wearing a bathrobe over a T-shirt and shorts, and Andrews again introduced herself and the other officers. She stated that she knew defendant had just gone to bed and asked if he was okay to talk, and he said he was fine. Andrews commented that she, like defendant, used to work third shift. (Id. at 10.) Andrews and McQuown both testified that defendant appeared alert. (Id. at 11; 47.)

The group proceeded back into the kitchen, and Andrews explained that she was "following up on a computer investigation in which images of [defendant's] family members had been posted to the Internet." (Id. at 11.)[3] She stated that the officers had come to defendant's

---

[2]In order to avoid confusion, I will refer to defendant's wife by her first name.

[3]McQuown testified that Andrews stated "we were there investigating an incident where some images of his family members had wound up on the Internet and we were trying to get to the bottom of that." (Id. at 48.)

2

house for the investigation, and "that it involved computers in his house." (Id. at 11.) She advised defendant that he was not under arrest or in custody, and that she was just following up on an investigation. She further advised defendant that he did not have to talk with her if he did not want to, but he agreed to speak. (Id. at 12.)

Defendant indicated that he did post photos of his family members to an on-line account, but not to an internet site. He later clarified that it was a "photo bucket" account, not a URL or web site others could visit. He could not recall the name of the site. (Id. at 12.)

Andrews asked defendant how many computers were in his residence, and defendant identified the computer in the family room, which belonged to his wife, and a computer upstairs that belonged to his children; he did not initially disclose the computer in the basement. (Id. at 12-13; 49.) Andrews asked about the computer in the basement, which Inthavy previously identified, and defendant responded: "Oh, yeah, there's a computer in the basement, but I haven't used that in a long time." (Id. at 13.) Andrews asked defendant whether he had any computer viruses, and he stated no; she further asked if he had anti-virus protection, and defendant replied that he had Norton anti-virus, which was up to date. (Id. at 13-14.) Andrews also asked if his wireless connection was password protected, and he said it was. (Id. at 15.)

Andrews then asked defendant for consent to search the computers in the residence, explaining that he had the right to refuse. (Id. at 15.) Defendant verbally consented to an examination of the computers. Andrews explained that the computers would be forensically examined, which would require their removal from the residence, and defendant again agreed. (Id. at 16; 31.) During this initial conversation, Andrews only asked about computers; she did not specifically mention external hard drives or other storage devices. (Id. at 32.)

Andrews then asked defendant to show her the computer in the basement, and he

3

agreed and started to lead her to the basement. (Id. at 17; 33.) Based on background information that defendant had some military experience, Andrews asked if there were any weapons in the basement. Defendant indicated that there were, and in response Detective McQuown took the lead into the basement. (Id. at 17.) In the basement, the officers observed a computer desk along the wall, which contained a desktop computer with an external hard drive attached via USB and two laptop hard drives. On the floor, they saw several laptops and CDs. (Id. at 17; 34; 50.)

At that point, Andrews read defendant a written consent form, which granted police permission to search: "My personal computer(s), electronic storage devices, peripheral data storage devices, manuals, books and any other related materials to include an examination of any data stored." (Govt.'s Ex. 1.) Andrews testified that as she read the form to defendant she explained which portions did not apply (i.e., those pertaining to residence, auto and cell phone searches). (Tr. at 17-20.) She further testified that she limited the scope of the consent to computers at one point connected to the internet, i.e. the items on the computer desk in the basement – the desktop computer with attached external hard drive and the two additional hard drives, as well as the two computers upstairs. The computers on the basement floor had their hard drives removed, and defendant stated that they were not connected to the internet. (Id. at 17-18; 35-36; 41.) McQuown confirmed that the focus of the consent was the computer and computer external devices on the computer desk in the basement. (Id. at 52-53.) While Andrews did not specifically ask for permission to take each item, she did specify the items on top of the computer desk. (Id. at 61.)

Andrews testified that after she read the form to defendant, she handed it to him so he could read it. He appeared to read, and then signed it. (Id. at 21-22; 41-42; 51.) He asked no

4

questions about the form. (Id. at 23; 51.) Andrews and McQuown signed the form as witnesses, and Andrews and defendant then stood there while McQuown started unhooking the items on top of the computer desk. (Id. at 22; 52.) The items McQuown unhooked were those Andrews had discussed with defendant – the items on the computer desk. (Id. at 25; 35; 54.)

At that point, defendant and Andrews went upstairs and retrieved the computers used by defendant's children and wife. (Id. at 25.) At the conclusion of the encounter, the officers provided defendant with a receipt for the items taken, which included the basement desktop computer (which contained two hard drives), the external hard drive attached to that computer, the two laptop hard drives on the basement computer desk, and the two computers used by defendant's wife and children. (Id. at 40-41; 60; see also Govt.'s Ex. 2.) The officers testified that defendant raised no concerns in response to the receipt. (Tr. at 42; 55.)

Defendant testified that when the police came to his home on March 18, his wife came into his room and woke him up. He stated that he got home from work at about 8:30 a.m., after working from 10:00 p.m. the previous evening until 8:00 a.m. that morning, and went to bed at about 9:00 a.m. He indicated that he had been up since about 3:30 p.m. the previous day. (Id. at 66-67.) However, on cross examination defendant admitted that his estimate as to when he went to bed that morning was off, as he was observed dropping off a form for his daughter at her school at 9:18 a.m. that morning. (Id. at 77.) He admitted that he returned to his residence at about 9:20 a.m., and that there was no way he was in bed asleep at 9:00 a.m. (Id. at 78.)

Defendant testified that his wife advised him the police wanted to look at his computers. He stated that he got up, put on his bathrobe and went downstairs. He testified that he encountered three officers, who indicated that they were concerned that his computers were

5

compromised. They asked if he was aware of any family photos on the internet, and he responded that there might have been photos on one internet site, the name of which he could not recall. He stated that because he just got out of bed, his brain was not functioning well at that point. (Id. at 68.)

Defendant testified that the officers asked if they could take his computers and do a forensic exam on them, and he said okay. (Id. at 69.) He stated that the officers specifically asked about computers connected to the internet. (Id. at 69-70.)

Defendant testified that he led the officers down into the basement, and as he was preparing to unhook the computer there – a Premio desktop computer – one of the officers stopped him and asked if he had any weapons. Defendant stated that he did, and Andrews then asked him to step out and allow McQuown to unhook the computer equipment.[4] She then asked defendant to accompany her upstairs to retrieve the computer from his daughter's room. (Id. at 70.)

Defendant testified that he understood he was giving permission to take his desktop computer, nothing else. He stated that on top of the desk in the basement he had an external hard drive sitting next to the desktop computer, as well as one hard drive from a laptop (he did not recall having two). He stated that he had a lot of devices around the room, as he collected broken computers, repaired them and gave them to others. (Id. at 71.)

Once they returned upstairs, defendant gave permission to take his daughter's computer, unhooked it and gave it to Andrews. (Id. at 72.) After that, they proceeded to the

---

[4] Defendant testified that he believed the question about weapons arose after the officers saw a holstered handgun on top of a file cabinet in the basement, as well as a crossbow, bow and arrows. (Id. at 82.)

6

family room, where he unhooked the computer there and gave it to the officers. (Id. at 73.) Defendant testified that as he was waiting for the officers to complete a receipt for the items taken, he saw McQuown come upstairs with a computer in hand and a full backpack, which he had not previously noticed. He stated that McQuown passed by hurriedly. (Id. at 74.)

Defendant testified that he signed the written consent form just before the officers left his house; it was the last thing he did. He stated that when presented with the form, he asked his wife for his reading glasses, as he could not see up close without them. Unable to locate them, he signed the form without reading it. He testified that Andrews did not read the form to him or explain it. (Id. at 75.) He stated that Andrews told him only that the form gave the officers permission to look at his computers. He denied that the form was read to him in the basement. (Id. at 83.) He admitted that he signed the form and filled in the time; he stated that he could not recall writing the date, but admitted that the date was in his handwriting, although not his "normal" handwriting. (Id. at 85-86.)

Defendant testified that his understanding was that the officers wanted to take his computers to see if they were compromised. (Id. at 75.) He stated that he did not give permission to take anything other than computers; he did not give permission to take any external hard drives. (Id. at 76.) Defendant admitted that he was given receipts for the items taken, but testified that he did not look at them. (Id. at 87.) He also admitted that even though Andrews provided her phone number, he did not thereafter call and complain about the items taken. (Id. at 92-93.) He also denied checking the basement to see what was taken right after the officers left. (Id. at 93.) He admitted that he went into the basement later that day, but denied noticing the specific items that had been removed from the top of his desk. (Id. at 94-95.) Nevertheless, he was able to recall a number of specific items that remained on his desk.

7

(Tr. at 96.)

## II.  DISCUSSION

The Fourth Amendment permits warrantless searches based on voluntary consent. See, e.g., United States v. Stribling, 94 F.3d 321, 324 (7th Cir. 1996) (stating that voluntary consent to search "lifts" the warrant requirement).  In the present case, defendant concedes that he voluntarily consented to a search of his computers.  However, he argues that the search exceeded the scope of his consent in two respects.  First, he contends that his consent was limited to investigation of a breach of the security of his computers.  Second, he argues that he did not consent to the search of the USB connected hard drive seized from the basement computer desk.

"The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Florida v. Jimeno, 500 U.S. 248, 251 (1991).  "Factors the court must consider include, but are not limited to, the defendant's behavior during the search, the purpose of requesting consent to search, the location of the search, and any show of force." United States v. Osuorji, 32 F.3d 1186, 1190 n.3 (7th Cir. 1994).

### A.  Subject Matter of Consent

Relying on United States v. Richardson, 583 F. Supp. 2d 694 (W.D. Pa. 2008), defendant argues that the police caused him to believe that he was a victim of a computer security breach, that his consent was limited to investigating such a breach, and that the search for images of child pornography thus exceeded the scope of his consent.  Like the magistrate

8

judge, I reject the argument.

In Richardson, officers conducting a child pornography investigation obtained consent to search the defendant's computers by leading him to believe that he had been a victim of credit card fraud. Id. at 698-701. The officers then conducted a forensic examination of the computers, which revealed images of child pornography. Id. at 703-04. The lead officer admitted that she used a ruse to obtain consent, which she maintained throughout her dealings with the defendant. Id. at 701-05. The court found that, based on the officers' artifice in approaching the defendant as a potential crime victim, his consent was limited to evidence of illegal credit card activity over the internet. Id. at 718.

The present case involves no similar trickery. Andrews told defendant:

> I was following up on a computer investigation in which images of his family members had been posted to the Internet. And I told him that I was concerned because they were images of his family members. And, that's why I had come to his house for the investigation, and that it involved computers in his house.

(Tr. at 11.) Andrews may not have fully disclosed the nature of her investigation, but she made no false or misleading statements. She did not lead defendant to believe that he – as opposed to his family members – was a victim, or suggest that the officers would refrain from searching the computers for any evidence of his potential wrongdoing. Further, unlike in Richardson, nothing in Andrews's preliminary statements suggested a limitation on the scope of the search. In Richardson, the court found the forensic search for images wholly unrelated to the expressed object of the search – illegal, on-line use of credit cards. See id. at 720-21. Here, the conversation between defendant and Andrews, although general, pertained to "images" of defendant's family members, and Andrews specifically advised defendant that the computers would be removed from the residence for a forensic exam. (Tr. at 16.) Finally, as the

9

magistrate judge explained, an investigation into how the images Andrews mentioned ended up on the internet "would naturally include a review of image files on [defendant's] computer to determine, for example, if the specific photographs were on [defendant's] computer, as well as internet protocol data to determine, for example, which computer might have posted the photographs." (R. 24 at 11.)[5]

**B.    External Hard Drive**

Defendant also argues that the search of the USB connected hard drive seized from the basement computer desk exceeded the scope of his consent. He notes that his initial exchange with Andrews was somewhat ambiguous, and that Andrews did not specifically state that the officers wanted to seize and search external drives or storage devices. He therefore contends that a reasonable person would understand that the consent included only defendant's computers, not any additional, external devices. I reject this argument as well.

Andrews and McQuown both testified that, once they reached the basement and observed the items there, Andrews told defendant that the consent search would include the computer and computer external devices on top of the computer desk. The officers also testified that prior to the seizure of the items from the computer desk, Andrews read defendant the written consent form, which specifically granted permission to search "personal computer(s), electronic storage devices, peripheral data storage devices, manuals, books and any other related materials to include an examination of any data stored." (Govt.'s Ex. 1.) The

---

[5]As the magistrate judge also explained, it was reasonable for the officers to consider the possibility of a security breach as the cause of the posting of the pictures, and thus to question defendant about his virus and password protection. Nothing in these questions suggests a limitation on the scope of the search, such that the officers could not view the images found on defendant's computers.

officers testified clearly and consistently with one another, and I find their testimony credible. I further find that Andrews clarified any ambiguity in her previous requests when she specified that the search would include items on top of the computer desk, and that the clear language of the consent form likewise precluded any possible misunderstanding.

Defendant testified that he understood the consent to include only the computer in the basement, not the external hard drive, and claimed that the officers had him sign the form at the end of the encounter. I find his testimony in this regard incredible. Despite being sequestered, the officers both testified that Andrews specified the items to be taken and read the form to defendant in the basement, and I adopt their version of events over defendant's. It would make little sense for the officers to present the written consent form, which had been tailored to the circumstances, to defendant only after they had seized the items from the basement desk. I likewise find incredible defendant's claims that he did not read the form because he could not find his glasses. As the magistrate judge noted – and as the record reflects – defendant apparently read the form in court during the evidentiary hearing without his glasses. (R. 24 at 9-10.) Further, defendant's testimony regarding the form was, as the magistrate judge also observed, evasive. (R. 24 at 9.) For example, he refused to provide clear answers as to whether he filled out the date on the form. And, as indicated in the fact section above, the government was able to demonstrate that defendant may have attempted to mislead the court as to when he went to bed on the morning of March 18, in an apparent attempt to bolster his claim that he was too groggy to understand what was going on.[6]

It is well-settled that if a defendant intends to limit the scope of his consent in any

---

[6]Defendant also apparently attempted to conceal the basement computer from the officers on March 18.

11

manner, the burden is on him to do so. E.g., United States v. Patterson, 97 F.3d 192, 195 (7th Cir. 1996). In the present case, defendant made no attempt to limit the scope of his consent to just the computer on the basement desk. Further, the court may infer from a defendant's failure to object that the search is, in fact, within the scope of the consent. United States v. Patten, 183 F.3d 1190, 1194 (10th Cir. 1999); see also United States v. Torres, 32 F.3d 225, 231 (7th Cir. 1994). Defendant did not object when he observed McQuown unhooking the items on the basement desk, when he saw McQuown exit his house carrying the basement computer and a full backpack, or when he was provided with receipts for all of the items taken. Nor did he later contact Andrews to complain about the items taken. Defendant testified that he never read the receipts or examined the basement desk to see what had been taken, but his claims in this regard were also evasive and unconvincing. Indeed, his testimony revealed that he, in fact, did scan his desk to see what had been taken, as he was able to specifically identify various items – including a router, two keyboards and two monitors – that remained on the desk after the officers left. (Tr. at 96.)[7]

## III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the magistrate judge's recommendation is adopted, and defendant's motion to suppress is **DENIED**.

Dated at Milwaukee, Wisconsin, this 22nd day of July, 2009.
/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

---

[7]Because I find that defendant consented to the removal and search of the items on the basement desk and as indicated in the written consent form, I need not determine whether the external drive could be considered "part" of the computer, as the magistrate judge found. Nor need I address the government's inevitable discovery argument.

12