# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
    **Plaintiff,**

  v.                                      Case No. 09-CR-103

**KENNETH KRUEGER**
    **Defendant.**

## DECISION AND ORDER

Defendant Kenneth Krueger moves for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A), asking that his 216-month prison sentence for child pornography production be reduced to time served. For the reasons that follow, I deny his motion.

## I. FACTS AND BACKGROUND

The government charged defendant with six counts of production of child pornography, contrary to 18 U.S.C. § 2251(a), and one count of possession of child pornography, contrary to 18 U.S.C. § 2252(a)(4)(B). Defendant pleaded guilty to two production counts (counts four and six) pursuant to an agreement with the government.

The charges arose out of an FBI investigation regarding images of two minor girls that had been sent to the National Center for Missing and Exploited Children ("NCMEC") as part of another child pornography investigation. The images were traced to the Milwaukee area based on a first and last name appearing in two of the images. A search located a child with this name attending a school in this district. A school liaison officer identified a girl who appeared to be the child in the series provided by the NCMEC. On March 18, 2009, a Milwaukee police officer interviewed the child at her school, and she identified the photos as being taken of her.

She also identified defendant (her father) as the person who took the pictures.

Law enforcement then went to defendant's residence and obtained his consent to remove and examine his computers and other equipment. The examination revealed that defendant sexually exploited his own daughters to create images of child pornography. Regarding the image in count four, created in 2008, one of the girls was age 11 or 12 and the other four to five. Regarding the video in count six, created some time in late 2006, the girl was less than three.

Defendant was 48 years old at the time of sentencing, with no prior criminal history. The record offered little insight into why he committed these crimes. He described a good childhood, and his family remained supportive. His sister indicated that the family was shocked when this all came to light. In letters and other materials submitted by the defense, defendant was described as a hard working, family-oriented person, who volunteered at his children's school and in their other activities. He also presented various certificates he earned while detained in this case. Defendant served in the army from 1979 to 1981, then spent three years in the reserves, and compiled a good work record thereafter.

The sentencing guidelines recommended 262-327 months in prison, and the statutes of conviction carried a range of 15 to 30 years. The government recommended a sentence within the guideline range, while defendant advocated concurrent 15 year terms.

On consideration of the 18 U.S.C. § 3553(a) factors, I found a sentence of 216 months in prison, followed by 10 years of supervised release, sufficient but not greater than necessary. As I explained more fully in the statement of reasons memorandum, a prison term somewhat below the guideline range was appropriate due to certain flaws in U.S.S.G. § 2G2.1 and in light of defendant's positive background (no prior record, solid work history, strong family support).

2

However, I found that the defense recommendation failed to account for aggravating factors in the case, including defendant's abuse of his own children over a significant period of time and his commission of a sex act during the course of the offense. (R. 39 at 8.) Defendant is currently serving his prison sentence at FCI Milan, with a projected release date of August 15, 2024.

On September 4, 2020, defendant filed a pro se motion for compassionate release. I referred the matter to Federal Defender Services ("FDS"), pursuant to the court's standing order regarding First Step Act motions, and on November 7, 2020, FDS filed a supplemental motion. The government has responded and defendant replied. The matter is ready for decision.

## II.  DISCUSSION

**A.    Compassionate Release Standards**

Section 3582(c)(1)(A) authorizes the district court to grant what is commonly known as "compassionate release." The statute provides, in pertinent part:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A)(i). The statute contains three requirements: (1) the defendant must first make a request to the warden before applying to the court; (2) the defendant must then

3

demonstrate to the court that "extraordinary and compelling reasons" warrant a reduction in his sentence; and (3) the court must determine whether, even if such reasons are shown, a reduction of the sentence would be inconsistent with the applicable § 3553(a) factors and the need to protect the public. United States v. Cole, No. 08-CR-327, 2021 U.S. Dist. LEXIS 2404, at *5 (E.D. Wis. Jan. 7, 2021) (citing United States v. Rodriguez, 424 F. Supp. 3d 674, 680 (N.D. Cal. 2019)).

### 1. Exhaustion

Before 2018, the court could grant compassionate release only on a motion from the BOP. United States v. Sanford, No. 20-2445, 2021 U.S. App. LEXIS 2039, at *6 (7th Cir. Jan. 25, 2021). The First Step Act of 2018 amended the compassionate release statute to permit the court to adjudicate a motion directly from the defendant—provided, however, that the defendant must first present his request for compassionate release to the warden and exhaust administrative appeals (if the request is denied) or wait 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier. Id. The Seventh Circuit has held that, while this "exhaustion" requirement is not jurisdictional, it is a mandatory claim-processing rule which must be enforced if raised by the government. Id. at *7.

### 2. Extraordinary and Compelling Reasons

The statute does not define the term "extraordinary and compelling reasons." Rather, Congress instructed the Sentencing Commission, in promulgating general policy statements regarding the sentence modification provisions in § 3582(c)(1)(A), to describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria

4

to be applied and a list of specific examples. See 28 U.S.C. § 994(t).[1] The Commission's policy statement provides:

> Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—
>
> (1)    (A) extraordinary and compelling reasons warrant the reduction . . .
>
> (2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and
>
> (3) the reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13. The commentary to the policy statement indicates that extraordinary and compelling reasons exist under these circumstances:

> (A) Medical Condition of the Defendant.—
>
> > (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
> >
> > (ii) The defendant is—
> >
> > > (I) suffering from a serious physical or medical condition,
> > >
> > > (II) suffering from a serious functional or cognitive impairment, or

---

[1] Congress did state that: "Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." Id. Courts have held that "while rehabilitative efforts alone will not support compassionate release, the court may take such efforts into account as part of the analysis." United States v. Anderson, No. 14-CR-186, 2020 U.S. Dist. LEXIS 187983, at *13 (E.D. Wis. Oct. 8, 2020) (citing United States v. Brown, No. 4:05-CR-00227-1, 2020 U.S. Dist. LEXIS 87133, at *17-18 (S.D. Iowa Apr. 29, 2020)); see also United States v. Hudson, 967 F.3d 605, 613 (7th Cir. 2020) (noting that the court may in deciding a First Step Act motion consider the defendant's post-sentencing conduct as part of the § 3553(a) analysis).

> > (III) experiencing deteriorating physical or mental health because of the aging process,
>
> > that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.
>
> (C) Family Circumstances.—
>
> > (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.
>
> > (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.
>
> (D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

U.S.S.G. § 1B1.13 cmt. n.1.

The Commission has not updated its policy statement, which purports to require a motion from the director of the Bureau of Prisons, see U.S.S.G. § 1B1.13 cmt. n.4, since the passage of the First Step Act, which, as indicated above, allowed defendants to bring their own motions. Accordingly, "because the Guidelines Manual lacks an applicable policy statement, the trailing paragraph of §3582(c)(1)(A) does not curtail a district judge's discretion." United States v. Gunn, 980 F.3d 1078, 1080 (7th Cir. 2020); see also United States v. Brooker, 976 F.3d 228, 237 (2d Cir. 2020) ("[T]he First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release. Neither Application Note 1(D), nor anything else in the

6

now-outdated version of Guideline § 1B1.13, limits the district court's discretion.").

Giving the statutory terms their common meaning, a defendant seeking compassionate release must demonstrate that his situation is extraordinary, i.e., beyond what is usual, customary, or regular, and his need for release compelling, i.e., irreparable harm or injustice will result if relief is not granted. United States v. Scott, 461 F. Supp. 3d 851, 862 (E.D. Wis. 2020); see also Gunn, 980 F.3d at 1080 (noting that the Commission's analysis can guide discretion without being conclusive). In the context of the COVID-19 pandemic, courts have found that modification may be warranted if the prisoner demonstrates that he is particularly vulnerable to the virus based on his age, health status, or other specific circumstances; on the other hand, courts have tended to deny compassionate release requests based on general concerns about possible exposure in prison. E.g., United States v. Dover, No. 14-CR-196, 2020 U.S. Dist. LEXIS 133340, at *16-17 (E.D. Wis. July 28, 2020); see also United States v. Thomas, No. 1:11-CR-22, 2020 U.S. Dist. LEXIS 172963, at *6-7 (N.D. Ind. Sept. 22, 2020) (explaining that § 3582(c)(1)(A) contemplates a sentence reduction based on the particular circumstances of where the defendant is housed and his personal health conditions).

### 3. Section 3553(a) Factors

If the court decides that extraordinary and compelling reasons have been shown, it must also consider the applicable § 3553(a) factors to determine whether the sentence should be modified. See United States v. Saunders, No. 20-2486, 2021 U.S. App. LEXIS 3398, at *4 (7th Cir. Feb. 8, 2021) ("Because of the importance of the § 3553(a) factors, courts are not compelled to release every prisoner with extraordinary and compelling health concerns."); United States v. Ruffin, 978 F.3d 1000, 1001 (6th Cir. 2020) ("Even when extraordinary and compelling reasons exist, the statute leaves district courts with discretion to deny relief under

7

a balancing of the sentencing factors in 18 U.S.C. § 3553(a).").

The statutory factors include: (1) the nature and circumstances of the offense, and the history and characteristics of the defendant; (2) the need for the sentence imposed to provide just punishment, deterrence, protection of the public, and correctional treatment; (3) the kinds of sentences available; (4) the sentencing guideline range; (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution to the victims of the offense. 18 U.S.C. § 3553(a). In some cases, a court may find that the relevant § 3553(a) factors outweigh the extraordinary and compelling reasons warranting compassionate release and/or that release would undermine the goals of the original sentence. United States v. Black, No. 1:11-cr-00083, 2020 U.S. Dist. LEXIS 142523, at *11 (S.D. Ind. Aug. 10, 2020); United States v. Bartlett, No. 06-CR-273, 2020 U.S. Dist. LEXIS 101393, at *13-14 (E.D. Wis. June 9, 2020).

**B.    Defendant's Motion**

   **1.    Exhaustion**

Defendant made an administrative request to the warden on July 16, 2020, and more than 30 days have passed. (R. 51 at 1, 12; R. 57 at 5-6; R. 57-2 at 1.) He has therefore satisfied the exhaustion requirement, as the government acknowledges. (R. 60 at 2.)

   **2.    Extraordinary and Compelling Reasons**

Defendant seeks release based on the COVID-19 pandemic. He indicates that FCI Milan is a COVID-19 hotspot, where it is not possible to socially distance, inmates and guards often do not wear masks, proper cleaning supplies are inaccessible, and testing is rare. (R. 51

8

at 1-2, 14-23.)[2]  Defendant further contends that he is at high risk from the virus given his age (now 59), health conditions (obesity, hypertension, hypothyroidism, history of nephritis,[3] areas of fibrosis/scarring in the right lung), and history of smoking.  (R. 51 at 2, 40; R. 55 at 1, 3, 6-7, 10, 22-23; R. 57 at 1, 8.)  Finally, defendant indicates that he has attempted to rehabilitate himself in prison, completing programming, avoiding discipline, working, and participating in religious services.  (R. 51 at 3-4, 24-38.)  He concludes that he is remorseful for his crimes and has grown stronger mentally and spiritually while incarcerated.  (R. 51 at 6.)

The CDC has acknowledged that obese persons and current or former smokers are at increased risk from the virus, and that persons with hypertension might be at increased risk.[4]  See United States v. Lewellen, No. 09-CR-0332 (-2), 2020 U.S. Dist. LEXIS 90195, at *11 (N.D.

---

[2] The government notes that (as of the date of its response) FCI Milan had just one positive inmate and three positive staff members; three inmates have died since the start of the pandemic.  (R. 60 at 2.)  The most recent data from the BOP indicate that FCI Milan has 8 positive inmates, 4 positive staff, 3 inmate deaths, 0 staff deaths, 257 inmates recovered, and 76 staff recovered.  https://www.bop.gov/coronavirus/ (last visited February 10, 2021).  The BOP's website also discusses vaccination efforts, but it appears inmates and staff at FCI Milan have yet to be vaccinated.  Id.

[3] Nephritis is inflammation of the kidneys.  Stedman's Medical Dictionary 1190 (27th ed. 2000).  While I see no mention of nephritis in the medical records, the records do reference chronic kidney disease, stage II (mild), stating that the condition is "resolved."  (R. 55 at 3.)  Defendant does not in the supplemental motion from counsel rely on this condition.  (See R. 57 at 1, citing obesity, hypertension, hypothyroidism, and history of smoking.)

[4] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#serious-heart-conditions (last visited February 10, 2021).  The CDC does not list hypothyroidism as a COVID-19 risk factor, although this condition may make it harder for a person to lose weight.  https://www.verywellhealth.com/diet-and-weight-loss-tips-for-thyroid-patients-3233060   (last visited February 10, 2021).  In this case, a 9/10/18 medical note indicates that defendant lost about 40 pounds over three months.  (R. 55 at 13.)  However, a 2/28/19 note states that he gained about 20 pounds; at that time, he weighed 256 pounds.  (R. 55 at 9.)  An 8/28/18 note records a weight of 260 pounds.  (R. 55 at 6.)

9

Ill. May 22, 2020) (noting that courts have relied on the CDC's list of risk factors when assessing compassionate release motions during the COVID-19 pandemic). The CDC has further recognized that, while the elderly are most vulnerable, the risk increases with age, with persons aged 50-64 at four times higher risk of hospitalization than those aged 18-29.[5] Courts have found that inmates with these characteristics may be eligible for compassionate release during the pandemic. See, e.g., United States v. Edwards, No. 14-cr-30013, 2021 U.S. Dist. LEXIS 4330, at *5 (C.D. Ill. Jan. 11, 2021) ("Defendant is a 44-year male who suffers from uncontrolled hypertension and is considered clinically obese as he has a BMI of 34.1[.]"); United States v. Terraciano, No. 2:17-cr-00187-KJM-2, 2020 U.S. Dist. LEXIS 183414, at *8-8 (E.D. Cal. Oct. 2, 2020) (collecting cases recognizing hypertension, obesity, and history of smoking as co-morbidities supporting compassionate release); United States v. Davies, 469 F. Supp. 3d 175, 178 (S.D.N.Y. 2020) (granting release to 60 year-old inmate with high blood pressure, hypertension, and obesity).

On the other hand, as the government notes, defendant's medical records document no specific problems related to his weight. It appears he has in recent years weighed around 260 pounds, which produces a BMI of 34.3 at his height of 6'1". (R. 55 at 1, referencing weights of 257 and 262 pounds; R. 55 at 6, 260 pounds.)[6] While this places defendant in the obese category (a BMI of 30 or greater),[7] BMI has clinical limitations, since it does not differentiate

---

[5]https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited February 10, 2021).

[6]The PSR reported a height of 6'1" and weight of 230 pounds. (PSR ¶ 67.)

[7]https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm (last visited February 10, 2021).

10

between excess fat, muscle, and bone mass.[8] The medical records further indicate that defendant's blood pressure appears to be under good control with medication, with defendant denying side effects, chest pain, or shortness of breath. (R. 55 at 6, 8, 9.) And it is unclear whether the "minimal" scarring/fibrosis noted on 2010 and 2012 chest x-rays is related to defendant's history of smoking or otherwise reflects an increased risk of severe illness from COVID-19.[9] (R. 55 at 22-23.) In the supplemental motion, FDS states that defendant reported to counsel that he smoked for 15-20 years before quitting in 1994 (R. 57 at 8), but there is no specific medical evidence indicating that defendant is at increased risk due to his history of smoking.

> As courts have noted, while it is proper to rely on the CDC's expertise,
>
> a person's medical condition is not automatically extraordinary and compelling because it appears on the CDC's list of underlying medical conditions that increase the risk for a severe COVID-19 outcome. Rather, the CDC guidance on the risks of COVID-19 must be viewed in light of the medical history and circumstances of the individual moving for compassionate release.

United States v. Moore, No. 14-315-06, 2020 U.S. Dist. LEXIS 232051, at *6 (E.D. Pa. Dec. 10, 2020); United States v. Uriarte, No. 09-CR-332 (-03), 2020 U.S. Dist. LEXIS 215775, at *11 (N.D. Ill. Nov. 18, 2020) (noting that diagnosis with a CDC-recognized COVID-19 risk factor, such as obesity, does not automatically entitle a defendant to a sentence reduction, as each case must be assessed on its facts); United States v. Patterson, No. 13-CR-193, 2020 U.S. Dist. LEXIS 205991, at *16-17 (E.D. Wis. Nov. 4, 2020) ("While courts have properly relied on

---

[8] www.cdc.gov › obesity › downloads › bmiforpactitioners (last visited February 10, 2021).

[9] In a supplement, defendant indicates that he has had frequent respiratory infections, which may or may not be related to the lung lesions shown on the x-ray. (R. 56 at 1.) In the absence of medical documentation, it is difficult to assess this contention.

11

the expertise of the CDC in evaluating § 3582(c)(1)(A) motions during the COVID-19 pandemic, deeming an inmate diagnosed with any of the conditions listed by the CDC, regardless of severity, automatically eligible for compassionate release would be contrary to the individualized analysis contemplated by the statute."); see, e.g., United States v. Meyer, No. 14-CR-230, 2020 U.S. Dist. LEXIS 199117, at *20-21 (E.D. Wis. Oct. 27, 2020) (denying compassionate release where the defendant barely qualified as obese, and the medical records documented no problems related to his weight or hypertension).

Despite the limitations in the evidence, the government acknowledges that defendant may be able to establish a medical reason for early release. The government nevertheless opposes sentence modification under § 3553(a). (R. 60 at 3.) Specifically, the government argues that granting release nearly four years ahead of schedule would undermine the principal rationale of the court's sentence—to provide just punishment for horrible criminal conduct. The government further argues that early release for a producer of child pornography who has declined sex offender treatment in prison would undermine deterrence and endanger the public. (R. 60 at 1.) I will assume that defendant has established grounds for release under § 3582(c)(1)(A)(i) and proceed to consideration of the § 3553(a) factors.

### 3.    Section 3553(a) Factors

Defendant notes that he has served over 3/4 of the prison term, which, he contends, is sufficient to satisfy the purposes of sentencing. (R. 51 at 7; R. 57 at 2, 10.) While the amount of time the prisoner has served is a relevant consideration in deciding a compassionate release motion, see, e.g., United States v. Saunders, No. 20-2486, 2021 U.S. App. LEXIS 3398, at *4 (7th Cir. Feb. 8, 2021) (citing United States v. Pawlowski, 967 F.3d 327, 330 (3d Cir. 2020)), in this case I find that releasing defendant early would depreciate the seriousness of the offense,

fail to provide just punishment, and create unwarranted disparity with child pornography production offenders who committed less aggravated offenses.

As the government notes, defendant says little about the nature and seriousness of the offense, which involved not just amassing images of anonymous children, but the exploitation of defendant's own very young daughters over a significant period of time in order to gratify himself sexually and to produce images for the sexual gratification of others. (R. 60 at 4.) I specifically found that these aggravating factors warranted a significant sentence, one above the minimum. It is fair to say that this was the "principal rationale" for the sentence.

Defendant indicates that the sentence has already been incredibly punitive: the prosecution cut him off from his wife and children; during the prison term, his ex-wife died of cancer, and he could not be there to help her or their children before she passed; more recently, because of the pandemic, the BOP suspended visitation and programming. (R. 57 at 10-11.) Defendant's separation from his family was a consequence of his actions,[10] and the BOP's restrictions, designed to slow the spread of the virus (the very risk upon which defendant bases his motion), have made service of prison sentences more unpleasant for all inmates, not just defendant.

As the government also notes, at the original sentencing hearing I rejected the 15-year term recommended by the defense. Reducing the sentence to time served now would bring the sentence below the mandatory minimum for child pornography production offenses, creating unwarranted disparity with offenders who committed less aggravated offenses, e.g.,

---

[10]In a memorandum filed prior to the original sentencing hearing, defendant noted that "punishment for his crimes has already begun. He has had no contact with his children since the day of his arrest. His wife has initiated divorce proceedings." (R. 37 at 2.)

13

over a shorter period of time, involving no sex acts or sharing of images. (R. 60 at 3-4.)[11]

To be sure, I am not now bound by these determinations, as defendant notes in reply. (R. 61 at 1-2.) The compassionate release statute permits modification based on current circumstances. I nevertheless continue to believe the sentence imposed is necessary to provide just punishment, promote respect for the law, deter others, and avoid unwarranted disparity.

The parties debate whether early release will endanger the public. Defendant contends that this was his first offense and will be the last. (R. 51 at 6.) He reiterates that he has done well in prison, avoiding discipline, working hard, attending programming and religious services; he has had time to think about why he committed the offense, resolving never to re-offend. (R. 57 at 12-13.) He attaches to his pro se motion a copy of the BOP's Male Pattern Risk assessment, which reflects a "minimal" risk level. (R. 51 at 6, 39.) Defendant also notes that he will on release be on supervision for 10 years (R. 51 at 6), and the court could add a significant period of home confinement to his current conditions (which include sex offender treatment, computer monitoring, and no-contact with minors) in order to protect the public while reducing his risk of infection (R. 57 at 13). Finally, defendant contends that he has a solid release plan, living with his sister and hoping to get his old job back. (R. 51 at 8, 11; R. 57 at 13.) He argues that this is an ideal time for release—he has been punished, but he also has real hope for a successful future. (R. 57 at 12.)

The government responds that, while there is an ongoing debate regarding the

---

[11]Defendant notes that, while he has not yet served the minimum, he is close; with good time, 15 years translates to 12.75 years, and as of March 19, 2021, he will have served 12 years. (R. 61 at 2.) For the reasons stated in the text, a sentence above the minimum is necessary in this case.

14

recidivism risk posed by sex offenders generally, the record contains limited information regarding defendant's specific risk of re-offending. (R. 60 at 4-5.) According to the chief psychologist at FCI Milan, defendant was offered but declined sex offender treatment in March 2010. In the ordinary course, such treatment would again be offered when an inmate is two to three years from release (although it is not available at FCI Milan). (R. 60 at 5.) The government also notes that defendant has yet to be evaluated for possible civil commitment, something that occurs within 18-24 months of release. (R 60 at 5-6.) Finally, the government notes that immediate release would bypass the usual period of time in a halfway house, where defendant would have the opportunity for sex offender treatment and assessment. The government concludes that, while defendant is resolved never to re-offend, the court has before it little evidence other than his word. (R. 60 at 6.)

Defendant replies that, if protection of the public is a concern, the court should hold the motion in abeyance and ask the defense to arrange a sex offender evaluation, which FDS had not done earlier due to the urgency of the situation. (R. 61 at 2.) He notes that, under the Static 99, a publicly available sex offender risk assessment, he would likely score as a "very low risk." (R. 61 at 3.) He states that the Static 99 factors are consistent with the Justice Department's SMART publication, which would also suggest a low risk of recidivism. (R. 61 at 3-4.) Defendant also notes that, while he has not yet received sex offender treatment, it is unclear whether he will be housed in facility that offers such treatment; he could, however, receive treatment in the community as a condition of supervised release. (R. 61 at 5.) Finally, defendant indicates that no research supports the government's contention that release without first spending time at a halfway house increases risk to the public. (R. 61 at 5.) While RRC placement can help inmates find employment and housing, defendant indicates that he has no

15

such needs.[12] (R. 61 at 6.)

As the government acknowledges, defendant has done well in prison, which bodes well for the future. I will also accept that an assessment would likely suggest a low risk. On the other hand, the record still provides little insight into why defendant offended in this way. In the statement of reasons memorandum, I indicated that "it was hard to gain insight into what was behind his conduct, or whether with treatment offered through the Bureau of Prisons ('BOP') or in the community defendant would present a reduced risk of re-offending." (R. 39 at 4-5.) In his letter, defendant indicates that he looks forward to counseling on release, but he offers no explanation for his declination of treatment in prison. He writes that he has had time to reflect on his crime, but other than indicating that he was going through a difficult time in his marriage, using alcohol and marijuana, and lost touch with what was right and wrong, his letter offers little insight.[13] (R. 57-4.)

In any event, I acknowledge that defendant could receive treatment in the community, and Congress has stated that prison is not an appropriate means of promoting rehabilitation. 18 U.S.C. § 3582(a). I deny the motion for the reasons stated above, i.e., the need to provide just punishment, promote respect for the law, deter others, and avoid unwarranted disparity with other offenders.

---

[12]In a later submission, however, defendant indicates that he has learned his sister's residence is not an option due to sex offender residency restrictions in her community. His family is willing to assist him in finding an apartment elsewhere; the court could also order placement at Rock Valley RRC, which accepts sex offenders, as a condition of supervised release. (R. 62.)

[13]Defendant told the PSR writer that his marijuana use contributed to the offense, but he also indicated that he was able to stop using in 2008. (PSR ¶ 72.)

16

## III. CONCLUSION

**THEREFORE, IT IS ORDERED** that defendant's motion for release, as supplemented (R. 51, 57) is denied. Defendant's motion to file his medical records under seal (R. 55) is granted. The government also moves to seal its response, but that submission contains limited discussion of the medical issues, and the motion to seal does not otherwise identify good cause for withholding the response from the public record. See Gen. L.R. 79(d) (E.D. Wis.). Accordingly, the government's motion to seal (R. 59) is denied.

Dated at Milwaukee, Wisconsin, this 12th day of February, 2021.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge